IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LABORATORY CORPORATION OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>ASL-DEN, LLC f/k/a APP-UNIPATH, LLC d/b/a UNIPATH; and ATHANASSIOS PAPAIOANU,<br><br>                Defendants. | Civ. Action No. _:22-cv-_____ |

## COMPLAINT

NOW COMES Plaintiff, Laboratory Corporation of America ("Labcorp"), by and through the undersigned counsel, and complains of Defendants ASL-DEN, LLC f/k/a APP-UniPath, LLC d/b/a UniPath ("UniPath") and Athanassios Papaioanu ("Papaioanu") as follows:

## STATEMENT OF THE CASE

1.    This case involves UniPath's and Papaioanu's multiple, ongoing breaches of contractual commitments that they made to Labcorp in connection with an Asset Purchase Agreement entered into on or about October 19, 2020 ("Purchase Agreement") and a First Amendment to Asset Purchase Agreement entered into on or about February 1, 2021 ("Amended Purchase Agreement"), through which Labcorp purchased certain laboratory operations and assets of American Pathology Partners, Inc. ("AP2"), UniPath, and related entities.

2.    The parties closed on the asset purchase on or about February 15, 2021 ("Closing Date").

3.    As part of that asset purchase, Labcorp bargained and paid for UniPath's agreement to transfer, convey, assign, and deliver to Labcorp all of UniPath's intellectual property related to

its laboratory businesses in Colorado and Texas, to cease using certain names associated with the seller entities, and to cease laboratory operations at UniPath's laboratory in Denver within 120 days of the Closing Date of the Purchase Agreement. Labcorp also bargained and paid for UniPath's and Papaioanu's agreement not to compete with Labcorp in Colorado.

4.      UniPath and Papaioanu have failed to uphold their contractual commitments to Labcorp, as they continue to compete with Labcorp through the UniPath laboratory in Denver and have used the "UniPath" name and trademark after the Closing Date in violation of the Purchase Agreement.

5.      Labcorp now brings this action to enjoin UniPath and Papaioanu from further breaching their contractual obligations and to recover damages Labcorp has incurred because of Defendants' breaches and violations of Labcorp's rights.

## PARTIES

6.      Plaintiff Labcorp is a corporation formed and organized under the laws of the State of Delaware with its principal place of business in Burlington, North Carolina.

7.      Defendant UniPath is a limited liability company formed and organized under the laws of the State of Colorado with its principal place of business in Nashville, Tennessee.

8.      Defendant Papaioanu is a citizen and resident of Nashville, Tennessee.

## JURISDICTION AND VENUE

16.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1125.

17.      This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over Defendant UniPath because it consented and submitted to personal jurisdiction in this Court pursuant to the Purchase Agreement that it executed with Labcorp.

19.     This Court has personal jurisdiction over Defendant Papaioanu because, as a shareholder of AP2, he personally executed a restrictive covenant agreement and release agreement that was incorporated into and made a part of the Purchase Agreement so that he could receive significant financial benefits from the Purchase Agreement. As a result, he also consented and submitted to personal jurisdiction in this Court.

20.     Apart from having consented to personal jurisdiction, Papaioanu is subject to this Court's jurisdiction because he purposefully availed himself of the benefits and protections of the forum by negotiating extensively through numerous emails and phone calls with Labcorp personnel in North Carolina regarding the scope of the parties' transaction and the terms that would be included in the Purchase Agreement and its schedules and exhibits. Papaioanu further availed himself of the benefits and protections of the forum because, as part of the Purchase Agreement's closing and as expressly stated in the Purchase Agreement, Papaioanu received a significant closing bonus – upon information and belief, among other distributions – out of funds that Labcorp transmitted from North Carolina to AP2.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are subject to personal jurisdiction in this District.

## FACTS

22.     Labcorp is a leading global life sciences company that offers a comprehensive menu of frequently requested and specialty diagnostic tests through an integrated network of primary and specialty laboratories across the United States. The company provides a range of specialty testing services in such areas as women's health, allergy, diagnostic genetics,

3

cardiovascular disease, infectious disease, endocrinology, oncology, coagulation, pharmacogenetics, toxicology, and medical drug monitoring.

23.     In early 2020, Labcorp entered into negotiations to purchase certain assets of AP2 and related entities.

24.     AP2 was established in 2008 to create a network of anatomic pathology laboratories. Through several wholly owned subsidiaries and other arrangements, AP2 owned laboratories in Colorado, Florida, North Carolina, and Texas.

25.     Upon information and belief, Papaioanu was a founding shareholder of AP2.

26.     Upon information and belief, Papaioanu served in various roles at AP2 since AP2's formation, including as its Chief Information Officer, Chief Operating Officer, and Chief Development Officer.

27.     Upon information and belief, Papaioanu still held common and preferred shares of AP2's stock at the time of the asset purchase by Labcorp.

28.     One of AP2's subsidiaries was UniPath.

29.     UniPath's main laboratory was located at 6116 E. Warren Avenue in Denver, Colorado, 80222 ("Denver Lab").

30.     After extensive negotiations during which all parties were represented by counsel, Labcorp, on the one hand, and, *inter alia*, AP2 and UniPath, on the other hand, executed the Purchase Agreement on or about October 19, 2020.

31.     The Purchase Agreement designated AP2, UniPath, and nine other entities operating laboratories as "Seller."

32.    The Purchase Agreement designated New Enterprise Associates 12, Limited Partnership (an entity formed to hold the majority of the shares of AP2's stock) and Seller as "Seller Parties."

33.    Prior to the Closing Date, the parties to the Purchase Agreement executed the Amended Purchase Agreement on or about February 1, 2021 ("Amended Purchase Agreement").

34.    Except as noted herein, the Amended Purchase Agreement did not alter the Purchase Agreement's terms that are described in the allegations of this Complaint.

A.    **The Asset Purchase Agreement**

35.    Pursuant to the Purchase Agreement, AP2 and UniPath agreed to sell and Labcorp agreed to purchase "selected operating assets of Seller that are used or held for use in connection with Seller's clinical and anatomic pathology laboratory services business based in the States of Colorado and Texas, with customers in additional States (the "Business") …."

36.    Under Section 2.1 of the Purchase Agreement, AP2 and UniPath agreed to "transfer, assign, convey and deliver" to Labcorp "all of the assets and properties of Seller constituting the Business, other than the Excluded Assets (collectively referred to herein as the "Purchased Assets")."

37.    Under Section 2.1 of the Purchase Agreement, the Purchased Assets included tangible personal property owned by Seller for use in the Business; all inventory and supplies maintained by Seller for use in the Business; "all of the intangible rights and property of Seller associated with the Business, including Seller's Intellectual Property Rights (including specifically, all trade names and marks related to Seller's Business together with the goodwill associated with the names and marks), telephone and telecopy listings, website and domain names, going concern value and goodwill."

5

38.     The Seller Parties further agreed in Section 7.15 of the Purchase Agreement that "[a]fter the Closing, the Seller Parties (on their own behalf and on behalf of their Affiliates including, without limitation, the successors and assigns of any of the foregoing) agree that they shall not commercially use the names (i) Coastal, (ii) *UniPath*, (iii) Cedar, (iv) Cytology Associates, (v) DX Informatics, (vi) Alliance Health Services, (vii) UniPath Florida, (viii) UniSwab, (ix) UniPap, (x) Diagnostics for Life, (xi) Alliance Diagnostics, (xii) or *any variation, name, derivatives from or form thereof* of romanettes (i) through (xi) *or any other names used by the Business, or any trademarks or service marks associated therewith*." (emphasis added).

39.     Section 7.15 of the Purchase Agreement further obligated Seller to "take all necessary action to effect a change of name of Seller Parties to names other than those listed in this Section 7.15 or any derivations thereof as of the Closing Date."

40.     Under Section 7.15, "Seller Parties acknowledge and agree that [Labcorp] would suffer irreparable injury, which could not be fairly remedied by money damages, in the event of a breach by the Seller Parties of the provisions of this Section 7.15 and that [Labcorp] shall be entitled to an injunction restraining the Seller Parties from any breach thereof."

41.     Section 1.1 of the Purchase Agreement defines "Affiliate" to mean "with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person."

42.     Section 2.2 of the Purchase Agreement lists the "Excluded Assets" that Labcorp was not purchasing from Seller, which included the assets identified in Schedule 2.2 to the Purchase Agreement.

43.     Schedule 2.2 to the Purchase Agreement includes as Excluded Assets, *inter alia*, certain office and laboratory equipment for UniPath's Denver Lab as well as the Denver Lab's

certification issued by the Center for Medicare and Medicaid Services under the Clinical Laboratory Improvement Amendments ("CLIA certification").

44.     Section 2.2 of the Purchase Agreement further provides that

The Seller may use the Colorado CLIA certification listed on <u>Schedule 2.2</u> … at its related site (the "Facility") for up to one hundred twenty (120) days after the Closing Date ("CLIA Transition Period") solely for the purpose of transitioning Seller's current customers serviced at the Facility to a new facility not in the "territory" as such term is defined in and covered by any of the Restrictive Covenant Agreements (individually and collectively, the "RCA Territory").

45.     Under Section 2.2 of the Purchase Agreement, "[d]uring the CLIA Transition Period, prohibited activities in connection with the Facility shall include, but not be limited to … the use of any business name at or in connection with the Facility, including signage on the building."

46.     Labcorp's obligation to close on the asset purchase was subject to the fulfillment of the conditions listed in Article VIII of the Purchase Agreement.

47.     Within Article VIII of the Purchase Agreement, Section 8.9(f) obligated Seller to deliver to Labcorp the "Restrictive Covenant Agreements attached [to the Purchase Agreement] as <u>Exhibit 8.9(f)</u> … , duly executed as of the date of this Agreement by the parties listed on <u>Schedule III</u> in the form indicated on <u>Schedule III</u> with such Restrictive Covenant Agreements to become effective only as of and contingent upon the Closing" of the Purchase Agreement.

48.     Papaioanu and UniPath are listed on Schedule III of the Purchase Agreement.

49.     Section 12.11 of the Purchase Agreement and the Amended Purchase Agreement each provide that "[t]he Exhibits and Disclosure Schedules identified in this Agreement are incorporated into this Agreement by reference and made a part hereof."

50.     Section 12.9 of the Purchase Agreement and Section 6 of the Amended Purchase Agreement each state that they "shall be governed by and construed in accordance with the internal

7

laws of the State of Delaware, without regard to conflicts-of-law principles that would require application of any other law."

**B.**    **The Restrictive Covenant Agreements**

51.    Attached to the Purchase Agreement in Exhibit 8.9(f) are Restrictive Covenant Agreements executed by Papaioanu and UniPath (the "Restrictive Covenant Agreements").

52.    The Restrictive Covenant Agreements designate each of Papaioanu and UniPath as "Counterparty."

53.    The Restrictive Covenant Agreements provide that they were delivered pursuant to the Purchase Agreement and that each of Papaioanu and UniPath "acknowledges that [Labcorp] would not enter into, or consummate, the Purchase Agreement and the transactions contemplated thereby without the execution and delivery of this [Restrictive Covenant] Agreement."

54.    Section 3 of the Restrictive Covenant Agreements contain identical non-solicitation provisions that prohibit Papaioanu and UniPath, during the five-year period from February 15, 2021 ("Restricted Period"), from influencing or attempting to influence any (1) customer of Labcorp or the Business "to divert such customer's purchases of services associated with the Business to any Person, firm, corporation, institution, or other entity then in competition with [Labcorp] or its Subsidiaries or Affiliates;" or (2) "employee of [Labcorp] or its Subsidiaries or Affiliates, either directly or indirectly, to terminate his or her employment with [Labcorp] or any of its Subsidiaries or Affiliates."

55.    Section 2 of the Restrictive Covenant Agreements also contain non-competition provisions that restrict Papaioanu's and UniPath's conduct in the "Territory," which is defined in Section 4 of those agreements to mean Texas, Colorado, Louisiana, and Wyoming.

8

56.     Under Section 2 of the Restrictive Covenant Agreements, neither Papaioanu nor UniPath are allowed to "(a) engage, directly or indirectly, in a business that competes with the Business within the Territory … , or (b) provide information to, solicit or sell for, organize or own any interest in, or become employed by or engaged by, or act as agent for, any Person that is directly or indirectly engaged in a business in the Territory which is substantially similar to or competes with the Business," except for "holding (solely as a passive investment) not more than five percent (5%) of the outstanding shares of any publicly held company which may be so engaged in a trade or business substantially similar to or competes with the Business."

57.     Papaioanu negotiated with Labcorp to include in his Restrictive Covenant Agreement certain exceptions to his non-competition obligations.

58.     As a result of those negotiations, Section 2 of Papaioanu's Restrictive Covenant Agreement does not prohibit him from "[1] working for a division, entity, or subgroup of a company that engages in the Business so long as such division, entity, or subgroup does not directly or indirectly engage in the Business; [2] owning, working for, providing services in, contracting with or consulting with a hospital or a health system, including working as a pathologist in a hospital or health system, and is not competitive with [Labcorp]'s business and is not involved in such group … growing this business; [3] owning, providing services to, contracting with or consulting with an entity that owns its own laboratory where such laboratory does not provide external services; or [4] providing COVID PCR/RPP testing outside the Territory."

59.     In Section 7 of the Restrictive Covenant Agreements, Papaioanu and UniPath agreed that the non-competition, non-solicitation, and confidentiality provisions in each Restrictive Covenant Agreement would remain in effect for the Restricted Period, which was defined as five years from the Closing Date.

60. By executing each of their Restrictive Covenant Agreements, Papaioanu and UniPath each acknowledged in Section 7(a) of their agreements that:

a. "the restrictions contained in this [Restrictive Covenant] Agreement are reasonable and necessary to protect the legitimate interests of [Labcorp] and that [Labcorp] would not have entered into the Purchase Agreement in the absence of such restrictions"; and

b. "any breach by Counterparty of this [Restrictive Covenant] Agreement will cause continuing and irreparable harm to [Labcorp] for which monetary damages would not be an adequate remedy."

61. Papaioanu and UniPath also agreed in Section 7(a) of their respective Restrictive Covenant Agreements that, in the event of a breach, "[Labcorp] shall have the right to enforce the provisions of this [Restrictive Covenant] Agreement by seeking injunctive or other relief in any court, without a requirement that a bond be posted, and this [Restrictive Covenant] Agreement shall not in any way limit remedies of law or in equity otherwise available to [Labcorp]."

62. Papaioanu and UniPath also both agreed in Section 7(b) of their respective Restrictive Covenant Agreements that "[i]n the event that Counterparty breaches any of the Restrictive Covenants in this Agreement, then the Restricted Period shall be extended for a period of time equal to the period of time during which such breach occurs, and, in the event that Purchaser is required to seek relief from such breach in any court, board of arbitration or other tribunal, then the Restricted Period shall be extended for the period of time required for the pendency of such proceedings, including all appeals."

63. The Restrictive Covenant Agreements rely on the Purchase Agreement's definition of "Business" as "Seller's clinical and anatomic pathology laboratory services business based in the States of Colorado and Texas, with customers in additional States."

64. Section 9(c) of the Restrictive Covenant Agreements dictate that they "shall be construed and enforced in accordance with the substantive laws of the State of Delaware without regard to the principles of conflicts of laws of any jurisdiction."

## C.   The Escrow Agreement and the Parties Indemnity Obligations

65. Sections 3.2(a) and (b) of the Purchase Agreement (as amended) provide that Labcorp would deposit a certain portion of the purchase price it agreed to pay to purchase Seller's assets into an escrow account "[a]s partial security against any claims by [Labcorp] for indemnification pursuant to Section 11.2" of the Purchase Agreement ("Escrow Amount").

66. Under Section 3.2(b) of the Purchase Agreement, Labcorp and Seller Parties agreed that a designated escrow agent would hold the Escrow Amount (also designated as "Escrow Funds" or "Escrow Fund") pursuant to an Escrow Agreement attached as Exhibit 3.2(b) to the Purchase Agreement.

67. Section 3.2(b) of the Purchase Agreement provides that the Escrow Agreement will be for a four-year period after the Closing Date ("Escrow Period"), with a portion of the Escrow Amount to be released to AP2 on the two-year anniversary of the Closing Date, less any amounts subject to a pending claim for indemnification, and with the remaining Escrow Amount to be released to AP2 on the four-year anniversary of the Closing Date, less any amounts subject to a pending indemnification claim.

68. Under Section 11.2 of the Purchase Agreement, the Seller Parties, "jointly and severally, to the extent of the funds then available in the Escrow Funds … agree to indemnify,

defend and hold harmless [Labcorp] and its successors and assigns (each a "Purchaser Indemnitee") from or against, for and in respect of, any and all damages, losses, obligations, Liabilities, demands, judgments, injuries, penalties, claims, actions or causes of action, costs and expenses (including, without limitation, reasonable attorneys', experts' and consultants' fees) (collectively, "Losses") suffered, sustained, incurred or required to be paid by any Purchaser Indemnitee arising out of, based upon, in connection with or as a result of" certain enumerated circumstances or occurrences.

69. Under Section 11.2 of the Purchase Agreement, the enumerated circumstances or occurrences that will trigger the Seller Parties joint and several indemnity obligations include:

   a. "any inaccuracy in or breach of any representation or warranty made by any Seller Party in or pursuant to this Agreement"; and

   b. "the non-fulfillment, non-performance or other breach of any covenant or agreement to be performed by any Seller Party pursuant to any Transaction Document."

70. Section 1.1 of the Purchase Agreement defines "Transaction Documents" as, *inter alia*, "this [Purchase] Agreement, the Escrow Agreement, the Restrictive Covenant Agreements, … and all other written agreements, documents and certificates listed as closing deliveries in Article VIII, Article IX and/or as contemplated herein or by any of the foregoing documents."

**D.     The Parties Close on the Purchase Agreement**

71. On or about February 15, 2021, the parties closed on the Purchase Agreement.

72. At closing, Labcorp paid the amounts owed to the Seller, less the Escrow Amount, which it deposited with the parties' designated escrow agent to be held in escrow.

12

73.     At closing, the Seller executed a General Assignment and Bill of Sale through which it granted, sold, assigned, released, conveyed, transferred, set over and confirmed unto Labcorp the assets purchased pursuant to the Purchase Agreement.

74.     As noted in the Purchase Agreement's Disclosure Schedule Section 5.23, Papaioanu was to receive a substantial transaction bonus payment from AP2 upon the closing of the Purchase Agreement, which AP2 paid to Papaioanu – upon information and belief, among other distributions – out of funds that Labcorp transmitted to AP2 from North Carolina.

75.     Upon information and belief, Papaioanu received the listed transaction bonus.

**E.     UniPath, Under Papaioanu's Leadership and Direction, Continues to Operate the Denver Lab**

76.     Upon information and belief, after closing on the Purchase Agreement, AP2 sold or otherwise transferred the assets that Labcorp did not purchase to Ariana Sciences, LLC ("Ariana Sciences"), an entity formed by Papaioanu and other former officers, executives, directors, or members of AP2 in January 2021 to purchase the Excluded Assets from AP2.

77.     Ariana Sciences has the same address, registered agent, and many of the same officers and personnel that were associated with AP2 prior to the Closing Date.

78.     For example, in addition to Papaioanu leaving his role as Executive Vice President of Strategy & Operations/CIO of AP2 to become Ariana Sciences' President and CEO, the following individuals joined Ariana Sciences after the Closing Date:

    a.  Lynn Ayres left her role as AP2's director of lab operations to become Ariana Sciences' VP of Operations;

    b.  Jonathan Mancini left his role of AP2's Senior Director of Western Operations (a role in which he managed the Denver Lab) to become Ariana Sciences' Scientific Director;

    c.  Deborah Payne left her role as AP2's Vice President of Clinical Trials and Development, Senior Scientific Officer, and Clinical Consultant to become Ariana Sciences' Scientific Director; and

d.  Derek Sirhal left his role as a senior member of AP2's account management and business development team to become Ariana Sciences' Director of Strategic Accounts.

79.  Upon information and belief, Ariana Sciences owns a controlling interest in or otherwise has the ability to control UniPath.

80.  The most recent annual report for UniPath, which Papaioanu submitted to the Colorado Secretary of State on or about December 29, 2021, lists UniPath's principal address as the same Tennessee address at which Ariana Sciences maintains its principal office.

81.  Under Section 2.2 of the Purchase Agreement, UniPath was obligated to cease operating the Denver Lab by June 15, 2021—120 days after the Closing Date.

82.  UniPath recognized that it was obligated to cease providing laboratory services at the Denver Lab, as evidenced by the fact that on or about November 6, 2020, AP2 sent the Colorado Department of Labor a letter pursuant to the Worker Adjustment and Retraining Notification Act ("WARN Act") stating that AP2 and its subsidiary company, UniPath, "is to conduct layoffs at our Colorado-based facility. These layoffs will be permanent. Employee separations are expected to begin on or around January 22, 2021. Separations will continue until the facilities referenced below are substantially closed on or about Febraury [sic] 5, 2021, by which time all employees in all classifications will have been separated." The WARN Act letter identified the Denver Lab as the facility at which the layoffs would occur.

83.  Despite the representations in the WARN Act letter, the Denver lab was not closed.

84.  UniPath continues to operate the Denver Lab.

85.  Despite having an obligation not to compete in violation of their Restrictive Covenant Agreements, UniPath and Papaioanu (through and with Ariana Sciences) are still operating the Denver Lab to perform laboratory services that compete with the Business and to solicit and recruit laboratory staff within the restricted Territory.

14

86.     Although UniPath was obligated under Section 7.15 of the Purchase Agreement to immediately after the Closing Date effect a name change for UniPath, UniPath did not file a notice of name change with the Colorado Secretary of State until August 2021, when it changed its legal name to ASL-DEN, LLC.

87.     As of the filing of this Complaint, the Colorado Secretary of State continues to display "UniPath" as the trade name for ASL-DEN, LLC.

88.     The Denver Lab continued to display the UniPath name on a banner over its doors as shown in this photograph taken on or about March 7, 2022:



89.     As of the filing of this Complaint, Ariana Science's privacy policy that is publicly posted on its website contains "Additional Privacy Policies for Colorado UniPath Patients Only," which states:

**ADDITIONAL PRIVACY POLICIES FOR COLORADO UNIPATH PATIENTS ONLY**

UniPath, our Denver, Colorado-based laboratory, endorses, supports, and participates in the CORHIO (Colorado Regional Health Information Organization) electronic Health Information Exchange (HIE) as a means to improve the quality of your health and healthcare experience. The HIE provides us with a way to securely and efficiently share patients' clinical information electronically with other physicians and health care providers that participate in the HIE network.

Using the HIE helps your health care providers to more effectively share information and provide you with better care. The HIE also enables emergency medical personnel and other providers who are treating you to have immediate access to your medical data that may be critical for your care. Making your health information available to your health care providers through the HIE can also help reduce your costs by eliminating unnecessary duplication of tests and procedures. However, you may choose to opt-out of participation in the CORHIO HIE, or cancel an opt-out choice, at any time by using the request forms found at these links:  Opt-Out Form  Opt-In Form.  For more general information regarding the CORHIO HIE, please see www.corhio.org.

## F.     Labcorp Learns of Defendants' Violations of Their Contracts

90.     In late 2021, Labcorp first learned that AP2 was still operating a website that displayed the UniPath Florida name in commercial use in violation of Section 7.15 of the Purchase Agreement and that Ariana Sciences, which shared the same address for its principal office as AP2, was displaying the UniPath Florida and Alliance Health names in the provider portal of its webpage.

91.     Around that same time, Labcorp also learned that the Denver Lab was still being operated and that Ariana Sciences, under the leadership of Papaioanu as its President and CEO, was responsible for the lab's operations and was publishing job postings for employees to conduct laboratory testing at the Denver Lab.

92.     On November 30, 2021, Labcorp sent a letter to AP2, copying Papaioanu, demanding that AP2 and Papaioanu comply with their obligations under the Purchase Agreement.

93.     Upon information and belief, following receipt of the letter, AP2 altered its webpage to remove the trade name uses that violated the Purchase Agreement and to redirect its webpage to Ariana Sciences' webpage.

16

94.     On or about December 10, 2021, counsel for AP2 sent a letter to Labcorp's counsel responding to Labcorp's demand letter and asserting that "AP2 no longer operates commercially and does not provide any goods or services in any jurisdiction" and "exists as a legal entity only for the administrative purpose of winding down its affairs." The letter represented that Ariana Sciences had acquired from AP2 certain of the Excluded Assets listed in the Purchase Agreement.

95.     The December 10 letter further represented that AP2's counsel understood that Ariana Sciences' website developers "may have inadvertently carried over content which included references to the tradenames "UniPath Florida" and "Alliance Health," but that AP2's counsel understood those names had been removed.

96.     After conducting further investigations to determine which individuals and entities were responsible for the operation of the Denver Lab, Labcorp's counsel sent a letter to Papaioanu on March 29, 2022, demanding that he cease violating his Restrictive Covenant Agreement.

97.     Papaioanu, through counsel, responded on April 12, 2022, claiming that he did not consider himself to be violating his Restrictive Covenant Agreement because the Denver Lab allegedly does not process specimens for Colorado patients but only patients and medical providers in other states, including Florida and North Carolina, notwithstanding that Papaioanu's Restrictive Covenant Agreement defines "Business" as "Seller's clinical and anatomic pathology laboratory services business based in the States of Colorado and Texas, _with customers in additional States_." (emphasis added).

98.     In the April 12 letter, Papaioanu claimed to have never seen the Purchase Agreement notwithstanding that he was a founder and executive of AP2, was entitled to receive substantial sums as a direct result of the Purchase Agreement, was directly involved in negotiations surrounding the Purchase Agreement, and signed the Restrictive Covenant Agreement that relied

on definitions in the Purchase Agreement and expressly referenced the related Purchase Agreement.

99. Finally, the April 12 letter invited a discussion about how "Ariana Sciences has been evaluating how to consolidate its operations, *including the Colorado molecular processing center* and support operations which are highly complex."

100. On April 18, 2022, Papaioanu filed with the North Carolina Secretary of State an Application for Amended Certificate of Authority for Limited Liability Company changing the name from UniPath to ASL-DEN, LLC.

101. Counsel for the parties engaged in further discussions about Papaioanu's proposal for Ariana Sciences and UniPath to move the operations at the Denver Lab, however, Papaioanu's proposal estimated that the move would take 26 to 34 months.

102. After further discussions, Papaioanu provided Labcorp with a revised proposal for Ariana Sciences and UniPath to move the Denver Lab's operations within an estimated 13 to 20 months.

103. Labcorp rejected this proposal as the 120-day CLIA Transition Period following the Closing Date was included in the Purchase Agreement to allow UniPath time to cease and move its Denver Lab operations outside of the restricted Territory.

104. Because Labcorp has been unable to obtain Defendants' compliance with their contractual obligations, Labcorp now brings this lawsuit to enforce its rights and recover its damages.

## COUNT I—Breach of Purchase Agreement
### (Against UniPath)

105. Labcorp realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

18

106. The Purchase Agreement is a valid, binding agreement under Delaware law.

107. Labcorp fully performed all of its obligations under the Purchase Agreement.

108. Section 7.15 of the Purchase Agreement obligated UniPath and its Affiliates to cease all commercial use of the UniPath name after the Closing of the Purchase Agreement and to take all necessary action to change its name.

109. UniPath violated and is violating this obligation because, after the Closing Date, it continues to operate the Denver Lab under the UniPath tradename, to display the UniPath tradename on the website of its parent company, Ariana Sciences, and, at least as of March 2022, to display the UniPath name on banners outside the Denver Lab.

110. Ariana Sciences constitutes an "Affiliate" of UniPath as that term is defined in the Purchase Agreement.

111. Section 1.1 of the Purchase Agreement defines "Affiliate" to mean

With respect to a specified Person, a Person that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified Person. For purposes of this definition, the term "control" (including the terms "controlling, "controlled by" and "under common control with") means (a) the possession, directly or indirectly, of the power to vote 10% or more of the securities or other equity interests of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, by contract or otherwise or (c) being a director, officer, executor, trustee or fiduciary (or their equivalents) of a Person or a Person that controls such Person.

112. Section 1.1 of the Purchase Agreement defines "Person" to mean "any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind."

113. Upon information and belief, Ariana Sciences is an Affiliate of UniPath because Ariana Sciences (1) possesses, directly or indirectly, the power to vote 10% or more of UniPath's

19

equity interests, (2) possesses, directly or indirectly, the power to direct or cause the direction of the management policies of UniPath, by contract or otherwise, and/or (3) is a director, officer, manager, or other similar control person of UniPath.

114. UniPath agreed that this breach of the Purchase Agreement would cause Labcorp to suffer irreparable injury, which could not be fairly remedied by money damages and that Labcorp shall be entitled to an injunction restraining UniPath from continuing to breach Section 7.15 of the Purchase Agreement.

115. UniPath is also in breach of Section 2.2 of the Purchase Agreement, which allowed UniPath to "use the Colorado CLIA certification" for the Denver Lab during the 120-day CLIA Transition Period following the Closing Date "solely for the purpose of transitioning Seller's current customers serviced at the Facility to a new facility not in the 'territory' as such term is defined in and covered by any of the Restrictive Covenant Agreements" and prohibiting UniPath from using "any business name at or in connection with the Facility, including signage on the building …."

116. UniPath violated and is violating this obligation because, since the Closing Date, UniPath continues to operate the Denver Lab to perform laboratory services, continues to operate the Denver Lab under the UniPath tradename, and, at least as of March 2022, continues to display the UniPath name on banners outside the Denver Lab.

117. As a direct and proximate result of UniPath's breaches of the Purchase Agreement, Labcorp has suffered and is suffering irreparable harm to its good will and reputation, which harm is not readily quantifiable and/or cannot be compensated with monetary damages.

118. As a direct and proximate result of UniPath's breaches of the Purchase Agreement, Labcorp has suffered monetary damages in an exact amount to be proven and determined at trial.

## COUNT II—Breach of Restrictive Covenant Agreements
### (Against UniPath and Papaioanu)

119.     Labcorp realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

120.     The Restrictive Covenant Agreements are valid, binding agreements under Delaware law.

121.     The Restrictive Covenant Agreements were a material term of Labcorp's agreement to purchase the assets of, *inter alia*, AP2 and UniPath.

122.     UniPath and Papaioanu both received valuable consideration in exchange for the promises they made in the Restrictive Covenant Agreements, including substantial payments that Labcorp made for the assets, customer list, goodwill, and promises and covenants set forth in the Restrictive Covenant Agreements.

123.     Labcorp fully performed all of its obligations under the Purchase Agreement.

124.     The Restrictive Covenant Agreements' five-year term and four-state Territory are reasonable and necessary to protect Labcorp's legitimate business interests, including Labcorp's interest in retaining customers and employees, avoiding competition for customers and employees from recently purchased laboratories in geographic areas where the recently purchased laboratories operated and had established businesses, and to enable Labcorp to establish additional goodwill in the restricted Territory.

125.     Because UniPath and Papaioanu received considerable compensation in exchange for their assent to the Restrictive Covenant Agreements and were not prohibited from certain limited investments and because Papaioanu was not prohibited from working in any capacity in the Restricted Territory, enforcement of the Restrictive Covenant Agreements would not be inequitable.

126. UniPath and Papaioanu are breaching their Restrictive Covenant Agreements by continuing to operate the Denver Lab in the Restricted Territory and, in so doing, are using "non-public information about the Business … including, but not limited to, any proprietary knowledge, trade secrets, data, formulae, employee data, and client and customer lists and all documents, papers, resumes and records (including computer records), which were disclosed to or otherwise known to Counterparty as a direct or indirect consequence of Counterparty's association with the Business or its, his or her involvement in the transactions contemplated by the Purchase Agreement."

127. UniPath is breaching its Restrictive Covenant Agreements by operating the Denver Lab and thereby engaging "in a business that competes with the Business within the Territory."

128. Papaioanu is breaching his Restrictive Covenant Agreement by (1) continuing to operate the Denver Lab and thereby engaging "in a business that competes with the Business within the Territory" and (2) soliciting, selling for, organizing or owning any interest in, or becoming employed by or engaged by, or acting as an agent for (a) UniPath, when UniPath is directly engaged in a competing business in the Territory, and (b) Ariana Sciences, which is indirectly engaged in a competing business in the Territory.

129. Papaioanu and UniPath agreed that the Restrictions in their Restrictive Covenant Agreements are reasonable and necessary to protect Labcorp's legitimate interests and that any breach of their agreements would cause Labcorp to suffer irreparable harm.

130. Papaioanu and UniPath also agreed that Labcorp would have the right to enjoin any breaches of the Restrictive Covenant Agreements.

131. As a direct and proximate result of UniPath's and Papaioanu's breaches of their Restrictive Covenant Agreements, Labcorp has suffered and is suffering irreparable harm to its

legitimate business interests, which harm is not readily quantifiable and/or cannot be compensated with monetary damages.

132.    As a direct and proximate result of UniPath's and Papaioanu's breaches of their Restrictive Covenant Agreements, Labcorp has suffered monetary damages in an exact amount to be proven and determined at trial.

**COUNT III—Federal Unfair Competition,**
**False Representation, and False Designation of Origin**
**(Against UniPath and Papaioanu)**

133.    Labcorp realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

134.    As a result of the Purchase Agreement, Labcorp is the owner of the UniPath name and service marks, and all of the goodwill associated therewith.

135.    UniPath, which has changed its legal name to ASL-DEN, LLC and is operating under Papaioanu's leadership as a subsidiary or Affiliate of Ariana Sciences, continues, without Labcorp's authorization, to display the UniPath name and service marks, at a minimum, on Ariana Sciences' website and at the Denver Lab.

136.    UniPath's and Papaioanu's continued and unauthorized use of the UniPath name and service marks is causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion, mistake, and deception among the public and the trade as to the origin, source, sponsorship, approval, or affiliation of UniPath's services. Such conduct therefore constitutes a false designation of origin, and a false description and false representation of fact, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

137.    As a direct and proximate result of these activities, Labcorp has suffered, and will continue to suffer unless and until such activities are enjoined by this Court, irreparable damage

and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill. Such conduct has caused and, unless enjoined, will continue to cause Labcorp to lose sales to which it would otherwise be entitled.

138.    As acknowledged in the Purchase Agreement, UniPath's and Papaioanu's use of the UniPath name after its transfer to Labcorp is causing Labcorp to suffer irreparable harm, entitling Labcorp to an injunction against UniPath and Papaioanu.

139.    UniPath's and Papaioanu's conduct is causing, and is likely to continue to cause, injury to the public and to Labcorp, and Labcorp is therefore entitled to recover all damages sustained because of UniPath's and Papaioanu's actions, all profits realized by them from their unauthorized use of the UniPath name and marks, and costs and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

140.    As Labcorp placed UniPath and Papaioanu on notice of their unauthorized use of the UniPath name and marks, yet those uses have not ceased, UniPath and Papaioanu's actions have been willful, deliberate, and fraudulent, entitling Labcorp to recover treble damages and an award of reasonable attorneys' fees against these Defendants.

### COUNT IV—Violations of N.C. Gen. Stat. § 75-1.1
### (Against Defendants UniPath and Papaioanu)

141.    Labcorp realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

142.    UniPath's and Papaioanu's actions, described above – and including their breaches of their respective Restrictive Covenant Agreements, intentional conduct intended to conceal their breaches of contract, and false designation of origin and federal unfair competition in violation of 15 U.S.C. § 1125 – constitute unfair methods of competition, unconscionable acts and practices,

and unfair and deceptive acts and practices that are prohibited by North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("UDTPA").

143.   UniPath's and Papaioanu's actions, described above, offend established public policy of North Carolina in enforcing contracts, enforcing reasonable non-competition and non-solicitation provisions, and in promoting fair business competition.

144.   UniPath's and Papaioanu's actions, described above, are also immoral, unethical, oppressive, and unscrupulous.

145.   UniPath's and Papaioanu's actions, described above, were in trade or commerce as those terms are defined in the UDTPA.

146.   Labcorp is entitled to the UDTPA's protections, including injunctive relief.

147.   As a result of UniPath's and Papaioanu's unfair acts and practices, Labcorp has been damaged in an exact amount to be proven at trial and is entitled to recover damages, costs, and attorneys' fees as permitted by North Carolina General Statutes §§ 75-16, 75-16.1, including treble damages as allowed by the UDTPA for all damages suffered by Labcorp as a result of UniPath's and Papaioanu's unfair and deceptive actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Labcorp respectfully prays the Court as follows:

1.   That the Court enter judgment against UniPath and Papaioanu in Labcorp's favor;

2.   That the Court award Labcorp monetary damages against UniPath and Papaioanu in an exact amount to be proven and determined at trial;

3.   That the Court enter an injunction prohibiting UniPath, Papaioanu, and anyone acting in concert with either Defendant from violating their contractual obligations under the Purchase Agreement and/or Restrictive Covenant Agreements;

4.      That the Court enter an order pursuant to the express terms of the Restrictive Covenant Agreements extending UniPath's and Papaioanu's restrictions for a period of time equal to the period of time during which they were in breach of their agreements;

5.      That the Court enter judgment in Labcorp's favor against UniPath and Papaioanu for false designation of origin and federal unfair competition for their misuse of the UniPath name and related service marks and award Labcorp its damages, attorneys' fees, costs, and treble damages, together with permanent injunctive relief, and such further relief as may be necessary or appropriate to afford Labcorp complete relief in this matter;

6.      That the Court award Labcorp treble damages and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16;

7.      That the Court award Labcorp pre- and post-judgment interest, and other costs of litigation;

8.      That all issues of fact be tried before a jury; and

9.      That the Court award Labcorp such other and further relief as the Court deems just and proper.

Respectfully submitted this the 31st day of October, 2022.

KILPATRICK TOWNSEND & STOCKTON LLP

By:   /s/ Chad D. Hansen
         Chad D. Hansen
         NC Bar No. 32713
         Whitney R. Pakalka
         NC Bar No. 52611
         1001 West Fourth Street
         Winston-Salem, NC  27101-2400
         chadhansen@kilpatricktownsend.com
         wpakalka@kilpatricktownsend.com
         chstevens@kilpatricktownsend.com
         Telephone:  336-607-7300
         Facsimile:   336-607-7500

         *Attorneys for Plaintiff Laboratory*
         *Corporation of America*